| | | |
|---|---|---|
| LEVEYFILM, INC., F/K/A DON LEVEY STUDIO, INC., | | |
| Plaintiff, | | No. 13 C 4664 |
| v. | | Judge Thomas M. Durkin |
| FOX SPORTS INTERACTIVE MEDIA, LLC, FOX SPORTS NET CHICAGO HOLDINGS, LLC, COLLECTIVELY D/B/A THEJERSEYCHASER.COM; CHICAGO TRIBUNE COMPANY, LLC, TRIBUNE INTERACTIVE, LLC, COLLECTIVELY D/B/A CHICAGOTRIBUNE.COM, | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Leveyfilm, Inc. ("Leveyfilm")—a corporate vehicle for the business of photographer Don Levey—alleges that Fox Sports Interactive Media, LLC, and Fox Sports Net Chicago Holdings, LLC (collectively, "Fox"), used a photograph for which Leveyfilm holds the copyright without Leveyfilm's permission in violation of the Copyright Act of 1976, 17 U.S.C. § 501, and the Digital Millennium Copyright Act, 17 U.S.C. § 1202. *See* R. 1. Fox has moved for summary judgment on all counts in the complaint as they pertain to Fox. R. 31; R. 60. For the following reasons, Fox's motion is granted.

## Background

In December 1985, the month prior to their victory in Super Bowl XX, several Chicago Bears football players participated in the creation of a rap song and related video entitled the "Super Bowl Shuffle." R. 73 at 2-3 (¶¶ 5-6). Levey took a group photo of the players that was used as the cover of the record album recording of the song and a 20th Anniversary, DVD edition of the video. *Id.* at 3 (¶¶ 7-8); *see* R. 1-1 at 2-3, 5-6.

On December 2, 2010, one of the owners of the copyright of the video filed a complaint against certain defendants for unauthorized use of the video. R. 73 at 3 (¶ 9). Four days later on December 6, Danielle Wysocki, the creator and sole owner of the website www.thejerseychaser.com ("Jersey Chaser"), *id.* at 8 (¶¶ 24-26), posted an article on the website commenting on the lawsuit. *Id.* at 5 (¶ 14); *see* R. 1-1 at 5-6. Wysocki included a photo of the Super Bowl Shuffle DVD cover (which incorporates Levey's group-shot photo of the players) next to her article. R. 73 at 5 (¶ 16). Wysocki testified that she acquired the photo by downloading it from Google. R. 74-1 at 16-17 (57:19–58:1). Wysocki started the Jersey Chaser website in 2008 as entertainment for her friends and sorority sisters in college. R. 61-2 at 7 (26:20–27:1). Wysocki testified that she never made any money from the website, R. 61-2 at 14 (52:7-8); R. 74-1 at 38 (94:8-11), and she last posted an article on the website in January 2013. R. 74-1 at 45 (109:4-9). Wysocki explained that she no longer posts articles to Jersey Chaser, testifying, "It was a passion project, a hobby, and I just don't have the time." *Id.* (109:13-14).

In the month prior to posting the article on Jersey Chaser, Wysocki signed an "Affiliate and Advertising Agreement" that affiliated the Jersey Chaser website with a website called Yardbarker. R. 73 at 11 (¶ 36). Yardbarker is owned by Fox. *Id.* ¶ 35. The Yardbarker website contains links to articles on its affiliated websites such as Jersey Chaser. *Id.* at 9 ¶ 30. The Court's examination of Yardbarker's website reveals that it also sometimes displays text and photos from the articles produced by its affiliates.

The affiliate agreement between Wysocki and Yardbarker provides, in sum, that Yardbarker will include links to certain Jersey Chaser articles, R. 74-1 at 5 (§ 1(c)(iv)), in exchange for Wysocki installing a frame on the Jersey Chaser website that includes links to Yardbarker and Fox Sports. *Id.* at 5 (§ 2(c)-(d)). The agreement also obligates Yardbarker to provide advertising for Jersey Chaser to include on its website, *id.* § 1(a), and provides that Yardbarker and Wysocki will share the advertising revenue attributable to viewers of Jersey Chaser's articles. *Id.* at 5 (§ 1(a)-(c)). The affiliate agreement further provides that the "Affiliate publisher shall have control over the content and 'look and feel' of the Affiliate websites." *Id.* at 6 (§ 2(h)). Yardbarker, however, has the "sole discretion" to determine which Jersey Chaser articles Yardbarker will link to, *id.* at 5 (§ 1(c)(iv)), and Yardbarker can unilaterally discontinue the affiliate agreement. *Id.* at 6 (§ 3).

Peter Vlastelica, a co-founder of Yardbarker and now "senior vice-president of digital" at Fox Sports Interactive, R. 77-3 at 6 (20:14-16), testified that "Yardbarker does not control, police or oversee any of the content that's published at any of the

3

[affiliate] sites. Yarbarker's editorial role with respect to its affiliates is that [Yardbarker] from time to time, and when Yardbarker determines it's appropriate, link[s] to sites in the Yardbarker network from the Yardbarker homepage . . . ." *Id.* at 19 (70:7-12). Additionally, Vlastelica testified that the "content [of Yardbarker affiliate websites] was published on someone else's website. Not [Yardbarker's]." *Id.* at 24 (93:15-16). According to Vlastelica, the content on Yardbarker's affiliate websites "does not reside on a server that belongs to Yardbarker or Fox Sports or any site that is owned or operated by Yardbarker or Fox Sports." *Id.* at 27 (102:7-9). Vlastelica explained further that "at most [the content] would have been linked to with [Yardbarker's] headline and maybe some excerpt of the text. But the article itself and the image . . . would only exist on the jerseychaser.com." *Id.* at 102:15-19.

Leveyfilm submitted a declaration from Gary Sigman, a website development professional in response to Fox's motion for summary judgment. *See* R. 74-3 at 4-13. Sigman reviewed documents Yardbarker provided to its affiliates like Wysocki. Sigman notes that these documents provide, "You will not have to manually post any content to Yardbarker.com. All of your content is automatically entered into our syndication system via an RSS feed from your site." *Id.* at 11. Sigman states that "RSS feeds are constructed so that all elements of Ms. Wysocki's article would have been part of the feed to Yardbarker, including but not limited to URL, headline, article and photographic images." *Id.*

In response, Fox has submitted an affidavit from Mark Johns, a co-founder of Yardbarker and currently a consulting engineer for Yardbarker. *See* R. 77-2. Johns

"architected Yardbarker's technical infrastructure, managed the engineering and product teams, and wrote much of Yardbarker's code." *Id.* ¶ 1. Johns states, "Since the inception of Yardbarker to the present, Yardbarker has maintained and followed, through its software code, a strict policy of never uploading images (as opposed to text or text-based markup, such as HTML) that were contained in articles that Yardbarker's affiliate websites publish." *Id.* ¶ 3. Johns also states that "RSS users such as Yardbarker can configure their RSS feed reader so that only certain types of information are uploaded to its servers. From Yardbarker's inception through December 2010, . . . Yardbarker's RSS feed reader was configured in such a way that it would not accept the upload of images onto its computer system." *Id.* ¶¶ 5-6. According to Johns, "Yardbarker . . . [did] not upload[] the 20th Anniversary Commemorative Edition of the Super Bowl Shuffle video . . . that Danielle Wysocki used in connection with a news article published on December 6, 2010." *Id.* ¶ 8.

In response to Johns's affidavit, Leveyfilm submitted another report from Sigman stating that Johns "suggests a false dichotomy between 'text or text-based markup' on the one hand, 'as opposed to images' on the other." R. 82 at 11 (¶ 5). Sigman states further that Johns's assertion that "Yardbaker's RSS feed 'reader' was somehow modified to not allow 'upload of images' as opposed to 'text or text-based mark-up' is also technologically imprecise," and Johns's "use of the word 'upload' as a possible function that was somehow disabled in Yardbarker's RSS feed reader is misleading." *Id.* at 12 (¶ 6).

In addition to the evidence in the record, a visit to the page of Yardbarker's website displaying Wysocki's article and the photo at issue reveals that although it is possible to view Wysocki's article and the DVD cover photo on Yardbarker's website at http://www.yardbarker.com/nfl/articles/super_bowl_shuffle_writer_take_mtv_and_vh1_to_court/3741964, the web address for the photo itself is a Jersey Chaser address at http://thejerseychaser.com/wp-content/uploads//superbowl-300x429.jpg.[1] While none of the parties have raised this fact, the Court takes judicial notice of the fact that these are the correct web addresses for (1) Yardbarker's web page displaying the article and photo, and (2) the DVD cover photo itself. These facts are proper subjects of judicial notice because they "can be accurately and readily determined" by using well-known, non-party web browsers "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Fox argues that it cannot be liable for any illegal copying of the DVD cover photo because Wysocki admitted that she copied the photo, and Vlastelica and Johns stated that the photo was never contained on a Fox-owned server. Alternatively, Fox argues that Wysocki used the photo to report news, which is a use that is protected by the "fair use" exception to copyright law.

Leveyfilm argues that Fox can be held liable for Wysocki's actions because "the Fox Defendants maintained substantial control over the Jersey Chaser website. . . . [and] Fox Sports Interactive was contractually in control of material aspects of

---

[1] Using Microsoft's Internet Explorer browser, this fact is revealed by right-clicking on the photo and viewing "properties." Using Google's Chrome browse, this fact is revealed by right-clicking on the photo, choosing the option "open image in new tab," and viewing the web address.

Wysocki's website and its activities." R. 72 at 14. Leveyfilm argues, further, that "although Defendants claim they never posted, hosted or otherwise allowed Leveyfilm's Photograph to reside on Fox's servers, that too is a disputed issue which remains to be resolved by a jury." *Id.* Leveyfilm also argues that Wysocki's article does not constitute "bond fide" news reporting and thus is not protected by the fair use exception. *Id.* at 8-9.

Fox initially requested leave to file this motion on September 3, 2013, R. 26, but briefing was delayed because Leveyfilm sought additional discovery in order to respond to the motion. *See* R. 29; R. 30; R. 33; R. 45. Specifically, Leveyfilm sought the following:

- the deposition of Wysocki;

- a Rule 30(b)(6) deposition of Fox;

- depositions of Fox "personnel . . . in order to explore issues which relate to [the fair use defense], and the factor of the Defendants' behavior, including but not limited to . . . the state of mind of internal Fox personnel with respect to the purpose of the blog post"; and

- the production of documents regarding Fox's policies regarding use of and payment of fees for reproductions.

*See* R. 33 at 11-13. The Court gave Leveyfilm permission to take discovery relating to the relationship between Fox, Yardbarker, Jersey Chaser and Wysocki, including document discovery and depositions of Wysocki and Vlastelica. *See* R. 43 at 42:21-25; R. 58 at 16:21. The Court also instructed Leveyfilm that if it felt this discovery was insufficient to respond to Fox's motion, Leveyfilm could incorporate such an

argument into its opposition to Fox's summary judgment motion. *See* R. 66 at 9:4-9.

In its opposition papers, Leveyfilm argues that additional discovery is needed

regarding

> the nature and extent of all the uses made of Plaintiff's work by Defendants, and the effect of the infringement on the market for Plaintiff's work. Also, intertwined throughout the [fair use] analysis, is the true intent and motive behind the Defendants' conduct including with respect to the "willfulness" aspect applicable to whether statutory damages and/or DMCA violations may proceed to trial. . . .
>
> Because "state of mind" and "motive" are at issue in many of these inquiries, and because information pertaining to a defendant's state of mind and/or motive is generally within the exclusive knowledge of defendants, plaintiffs should have an opportunity to engage in completion of discovery before the Court renders its decision on summary judgment, if at all.

R. 72 at 5-6. Leveyfilm argues further, that

> [a]ll of the issues raised by Fox in defense, e.g., fair use, lack of DMCA intent, no ownership or control, no copying, are fact intensive inquiries, and therefore, not properly resolved on premature summary judgment proceedings. . . . [And] at the end of Mr. Vlastelica's deposition Defendants opened the door to matters not merely involving the relationship between the parties, but the nuanced and highly technical underpinnings of the Yardbarker Network and its technological operations.

R. 82 at 4.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I. The Copyright Act

#### A. Infringement

The Copyright Act provides the following rights relevant to holders of photograph copyrights:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; . . .
> (5) in case of . . . pictorial . . . works, . . . to display the copyrighted work publicly.

17 U.S.C. § 106. Liability under the Copyright Act falls on "[a]nyone who violates any of the exclusive rights of the copyright owner," *id.* § 501(a), by copying the protected work, *id.* § 106(1)-(2), or distributing such copies, *id.* § 106(3), or

displaying the work, *id.* § 106(5).[2] A person can violate copyrights either directly or secondarily as an "infringer's accomplice." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).

### 1. Direct Infringement

Wysocki testified that she copied the photo and displayed it on the Jersey Chaser website. Vlastelica testified, and Johns stated in his affidavit, that Yardbarker linked to Wysocki's article and the photo, but neither the article nor the photo were ever stored on Yardbarker's servers. Fox argues that this evidence demonstrates that Fox cannot be liable for copyright infringement because "Fox never stored the Cover Image on its servers," and that "Fox [never] copied, distributed copies of, or displayed publicly the Cover Image." R. 61 at 4.

In support of its argument, Fox cites a Seventh Circuit decision applying the Copyright Act to activity on the internet—*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012). In *Flava Works*, an owner of certain videos sued a website that linked to non-party websites or servers where non-party individuals had illegally uploaded the videos in violation of the owner's copyright. *Id.* at 756. Despite the fact that the defendant website did not "host[] the video . . . on [its] website," the owner claimed that the website providing the links had also infringed the copyright. *Id.* The owner's claim was based on the fact that when a user clicked on the website's link the video played in a "frame" that made it look like the video was playing on the website even though it was really being played from the third-party server. *Id.*

---

[2] "To display the copyrighted work" means "to show a copy of it." 17 U.S.C. § 101.

As the Seventh Circuit noted, the user "may think . . . that he's seeing the video on [the defendant's] website. But actually the video is being transmitted directly from the server on which the video is stored [which is not the defendant website's server] to the [user's] computer." *Id.* The Seventh Circuit held that the defendant website was "not an infringer, at least in the form of copying or distributing copies of copyrighted work," because the defendant website's server did not contain a copy of the photo and the defendant website merely links to a non-party website or internet server that contains the copyright-infringing material. *Id.* at 758.

Fox also cites a Ninth Circuit case in which the court reached a similar conclusion. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). In *Perfect 10*, an owner of certain photos sued Google because Google linked to non-party websites and servers that contained infringing copies of the owner's photos. Google saved a "thumbnail" or reduced size copy of the photos on its servers but did not save the full size image. *Id.* at 1160-62. The Ninth Circuit held that Google could be liable for making the thumbnail size copies on its own servers, but not for linking to the full size copies on a server Google did not own. *Id.* at 1161 ("Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. . . . and does not constitute direct infringement of the copyright owner's display rights.").

Leveyfilm disputes Fox's interpretation of the facts on the basis of Sigman's report. *See* R. 72 at 16; R. 73 at 10-13 (¶¶ 32-42). Sigman, a website development professional, states that the RSS feed Yardbarker used to link to articles on websites like Jersey Chaser would upload content including photographs from Jersey Chaser to Yardbarker's website. Johns states, however, that Yardbarker's RSS feed was configured so that it would capture only "text and text-based markup" and not photographs, and that the photo of the DVD cover Wyscocki copied was not uploaded to Yardbarker's website. In response to Johns's affidavit, Sigman contends that Johns's assertion that "Yardbaker's RSS feed 'reader' was somehow modified to prevent 'upload of images' as opposed to 'text or text-based mark-up' is also technologically imprecise," and Johns's "use of the word 'upload' as a possible function that was somehow disabled in Yardbarker's RSS feed reader is misleading." R. 82 at 12 (¶ 6). Leveyfilm contends that Sigman's reports make it "clear [that] there is a triable fact dispute as to whether Fox copied the image or not." R. 82 at 3.

Contrary to Leveyfilms' contention, however, Sigman's report and the evidence in the record do not create a genuine dispute regarding whether the photo was uploaded or saved to Yardbarker's website. As an initial matter, although Sigman challenges Johns's terminology, Sigman does not challenge Johns's ultimate assertion that Yardbarker had taken measures to ensure that photos it received through RSS feeds were not saved to Yardbarker's servers. Furthermore, Leveyfilm has not submitted any evidence that Wysocki's article or the DVD cover photo were

ever saved on Yardbarker's servers. Without such evidence, Leveyfilm cannot show that there is a genuine question of fact regarding whether Yardbarker—and by extension, Fox—copied or displayed the photo. Moreover, as the Court noted earlier, although it is possible to view the DVD cover photo on Yardbarker's website at http://www.yardbarker.com/nfl/articles/super_bowl_shuffle_writer_take_mtv_and_v h1_to_court/3741964, the web address for the photo itself is a Jersey Chaser address at http://thejerseychaser.com/wp-content/uploads//superbowl-300x429.jpg. To be clear, the Court does not take judicial notice of the fact that the photo was never contained on Yardbarker's servers. Rather, there is no genuine factual dispute that the photo was never contained on Yardbarker's servers because Leveyfilm has not presented any competent evidence to rebut (1) Johns's assertion that the photo was not saved to Yardbarker's server, or (2) the evidence revealed by the Court's independent examination of the relevant web addresses. In accordance with the Seventh Circuit's decision in *Flava Works*, since there is no evidence in the record to allow a reasonable juror to conclude that that DVD cover photo was ever contained on Yardbarker's servers, Yardbarker did not copy the photo and Fox cannot be liable under the Copyright Act. *See* 689 F.3d at 758.

## 2. Contributory Infringement

Leveyfilm alleges that even if Fox did not directly copy the DVD cover photo, Fox is secondarily liable under theories of contributory or vicarious infringement. *See* R. 1 ¶ 56 ("one or more individual(s), firm(s), affiliate(s) or contractor(s) were a conscious, active and dominant force . . . contributing to cause . . . the unlawful

infringements herein alleged"); *id.* ¶ 57 ("there are various persons and firms who financially benefitted from and/or retained rights to exercise control over such unlawful activities as are alleged above, and are therefore vicariously liable for such infringements").[3]

"One infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).[4] The Seventh Circuit has explained further that contributory

---

[3] Fox argues that Leveyfilm has alleged only a direct infringement claim and not contributory or vicarious infringement claims. R. 77 at 8 n.5. It is true that in Count I—captioned "Copyright Infringement vs. Fox Sports"—Leveyfilm only alleges that Fox directly violated Leveyfilm's copyright by "downloading, storage, reproduction, uploading, display and dissemination of the copyrighted Work worldwide via the Internet, and by posting it on at least one web URL, www.TheJerseyChaser.com without having first obtained a license therefor." R. 1 ¶ 33. But in Count IV, Leveyfilm also alleges that "one or more individual(s), firm(s), affiliate(s) or contractor(s) were a conscious, active and dominant force . . . contributing to cause . . . the unlawful infringements herein alleged," *id.* ¶ 56; and that "there are various persons and firms who financially benefitted from and/or retained rights to exercise control over such unlawful activities as are alleged above, and are therefore vicariously liable for such infringements." *Id.* ¶ 57. Although Count IV's caption names "Doe I through Doe V" and not Fox, in the first paragraph in Count IV Leveyfilm also "alleges [Count IV] against defendant(s) Doe I through Doe V, and each of them jointly and severally, together with *Fox Sports* and Tribune." *Id.* ¶ 55 (emphasis added). Thus, even though Leveyfilm did not plead contributory and vicarious liability as separate counts against Fox, Leveyfilm put Fox on notice of the claims against it in Count IV. *See Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009) ("Litigants need not plead legal theories," but only must "provide fair notice to the defendant of the necessary elements of [the] claim.").

[4] The claim of inducing infringement, unlike the claim of encouraging infringement, requires an intent to cause direct infringement. *See Flava Works*, 689 F.3d at 758-59 ("inducing infringement [is] a form of contributory infringement that emphasizes intent over consequence") (internal citations omitted); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2005) ("Unlike an inducement claim, a claim for contributory infringement [by encouraging direct infringement] does not require a showing that the defendant intended to foster infringement."); *see*

infringement is "personal conduct that encourages or assists the infringement," *Flava Works*, 689 F.3d at 757, "with knowledge of the infringing activity." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).[5] Similarly, the Ninth Circuit has held that a defendant "may be contributorily liable for intentionally encouraging direct infringement if the [defendant] knowingly takes steps that are substantially certain to result in such direct infringement." *Perfect 10*, 508 F.3d at 1171.[6] Customarily, courts have required defendants to make a "material contribution" to the direct infringement in order to be liable for contributory infringement. *See Flava Works*, 689 F.3d at 759; *Perfect 10*, 508 F.3d at 1172; *Matthew Bender*, 158 F.3d at 706.

---

*also Metro-Goldwyn-Mayer Studios*, 545 U.S. at 942 (Ginsburg, J., concurring) ("While the two categories overlap, they capture different culpable behavior.").

[5] The Seventh Circuit did not expressly include the phrase "with knowledge of the infringing activity" in its definition of contributory infringement in the *Flava Works* opinion. Later in the opinion, however, the court noted that it would be "objection[able] to stretch[] the concept of contributory infringement far enough to make a social-bookmarking [website] a policeman of copyright law [because] the [website] usually won't *know* whether a video that a visitor bookmarks on the service's website is protected by copyright." *Flava Works*, 689 F.3d at 758 (emphasis added). Furthermore, the Seventh Circuit expressly took its definition of contributory infringement from *Matthew Bender*, 158 F.3d at 706, in which the Second Circuit held that a party "who, with *knowledge* of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer," and that "personal conduct that encourages or assists the infringement" is one "type" of such infringement." (emphasis added). *See Flava Works*, 689 F.3d at 757. For these reasons, the Court understands *Flava Works* to retain the knowledge element in contributory infringement.

[6] Since "intent to cause direct infringement" is not an element of "non-inducement" contributory infringement, the Court assumes that the Ninth Circuit meant for the word "intentionally" to modify "encouraging," not "direct infringement."

In support of its contributory infringement claim, Leveyfilm cites *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), in which the Ninth Circuit held that a defendant "materially contributed" to direct infringement because it provided "support services" without which "it would [have been] difficult for the infringing activity to take place." *Id.* at 264. In *Fonovisa*, the defendant hosted a flea market at which vendors sold illegal copies of movies, and the vendors were dependent on the flea market for a space to sell the illegal merchandise and for marketing to attract customers. *Id.* Leveyfilm argues that Fox and Yardbarker provided support services to Wysocki and encouraged her infringement of the DVD cover photo because Fox and Yardbarker entered into an affiliate agreement with Wysocki that provided Wysocki with a portion of the advertising revenue attributable to articles she produced.

The Seventh and Ninth Circuits have applied the law of contributory infringement to internet-based activities. *See Flava Works*, 689 F.3d at 758-59; *Perfect 10*, 508 F.3d at 1172. The reasoning of these cases supports Leveyfilm's argument that the affiliate agreement creates a genuine question of material fact as to whether Fox "materially contributed" to Wysocki's infringement of the DVD cover photo. In *Flava Works*, the Seventh Circuit held that a defendant website that permitted users to add links to its website to copyright-infringing videos was not contributory liable because "there [was] no evidence that [the defendant website] was encouraging" either the users who were creating the links or the individuals uploading the infringing videos to the internet. *Id.* at 758. The Seventh Circuit

hypothesized, however, that the defendant website might have been "encouraging infringement . . . [if] perhaps the [direct] infringer gets ad revenue every time someone plays the video that he posted on the Internet." *Id.* at 759. Furthermore, in *Perfect 10*, the Ninth Circuit held that Google "could be held contributorily liable" because it "substantially assisted websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials." 508 F.3d at 1172. Here, since Fox provides a financial incentive for Wysocki to provide more attractive content, and because Fox provides Wysocki access to a much larger audience, there is a question of fact as to whether Fox encouraged Wysocki's actions.

The problem for Leveyfilm's claim, however, is that the record is devoid of evidence that Yardbarker or Fox knew that its relationship with Wysocki would encourage her to infringe copyrights generally, or that Wysocki had infringed Leveyfilm's copyright specifically. In *Perfect 10*, the Ninth Circuit held that even if Google had "materially contributed" to the direct infringement at issue, Google could not be liable for contributory infringement unless it had "actual knowledge that specific infringing material is available using its systems." 508 F.3d at 1172. And in *Flava Works*, the Seventh Circuit noted that a finding of contributory infringement would only be appropriate if the defendant-website "know[s] whether a video that a visitor bookmarks on the . . . website is protected by copyright." 689 F.3d at 758. Moreover, in *Fonovisa*, which Leveyfilm primarily relies upon to support its argument, the knowledge element was not at issue. 76 F.3d at 264. Not

only is there a complete lack of evidence that Yardbarker or Fox knew that Wysocki would infringe or had infringed a copyright, Leveyfilm does not argue that there is any such evidence.[7] For this reason Leveyfilm's contributory infringement claim fails.

### 3. Vicarious Infringement

In addition to contributory infringement, a defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios*, 545 U.S. at 930. The Seventh Circuit has held that "a defendant is vicariously liable for copyright infringement if it has 'the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

Leveyfilm argues that there is a question of fact regarding Fox's vicarious liability because the affiliate agreement permits Yardbarker to "control" Jersey Chaser to such an extent that Yardbarker should be liable for any infringement by Jersey Chaser. Yardbarker, however, does not control the content of the Jersey Chaser website, let alone whether the Jersey Chaser website exists. The only "control" Yarbarker has with respect to Jersey Chaser is the right to unilaterally

---

[7] Leveyfilm does argue that Fox is not entitled to a safe harbor provision in the DCMA because Fox gained knowledge of Wysocki's infringement through this lawsuit. *See* R. 82 at 7-8. But the safe harbor is only necessary for an infringer, and Leveyfilm cannot show that there is a genuine question of fact regarding whether Fox is an infringer, whether direct or contributory.

terminate the affiliate agreement. Yet, Jersey Chaser existed for two years before Wysocki entered into the affiliate agreement with Yardbarker, and Wysocki's article about the Super Bowl Shuffle appeared within a month after the affiliate agreement was executed. There is no evidence in the record that Jersey Chaser's existence generally, or any infringement of the DVD cover photo specifically, was dependent upon Fox, Yardbarker, or the affiliate agreement.

Moreover, the "control" that courts have found to be sufficient to impose contributory infringement liability is much greater than the ability to unilaterally terminate an affiliate agreement. For instance, in *Fonovisa*, the defendant hosted a flea market at which vendors sold illegal copies of movies. The defendant flea market was dependent on the rent paid by the vendors and the admission fees charged to the customers. The vendors were dependent on the flea market for a space to sell the illegal merchandise and for marketing to attract customers. *See Fonovisa*, 76 F.3d at 264 ("Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market]. These services include, *inter alia*, the provision of space, utilities, parking, advertising, plumbing, and customers."). The court held that the defendant flea market's right to evict vendors was sufficient control to form a basis for contributory infringement liability. Here, it might be said that Yardbarker, in effect, has the right to "evict" Jersey Chaser from the affiliate agreement. But unlike *Fonovisa*, where eviction from the flea market would seriously damage the vendor's access to a market for its illegal merchandise, Yardbarker's termination of

the affiliate agreement would not alter Wysocki's ability to post information to the internet on Jersey Chaser. Wysocki had been posting information to Jersey Chaser for more than two years before she signed the affiliate agreement with Yardbarker, and could have continued to do so even in the absence of the affiliate agreement. She only stopped posting information when she no longer had time for her "hobby," not due to any action by Yardbarker. Thus, in these circumstances, Yardbarker's right to terminate the affiliate agreement is an insufficient basis upon which to impose contributory infringement liability on Fox.

### 4. Additional Discovery

Leveyfilm contends that the discovery taken to date is insufficient for the Court to grant Fox's motion for summary judgment on Leveyfilm's infringement claims. Leveyfilm argues that it has not had sufficient discovery regarding "the true intent and motive behind the Defendants' conduct." R. 72 at 5. As the Court emphasized, Fox's "knowledge" of Wysocki's infringement is an element of a contributory infringement claim. Leveyfilm, however, has had the opportunity to depose both Wysocki and Fox, and to seek documents relevant to the relationship between Fox, Yardbarker, Jersey Chaser, and Wysocki. This discovery should have provided Leveyfilm with evidence—if it existed—that Fox knew about Wysocki's infringement, but the record reflects that no such evidence came to light. Additional discovery is not required on this issue.

Leveyfilm also argues that it has not had sufficient discovery regarding Fox's "ownership or control" of Jersey Chaser. R. 82 at 4. But Fox (represented by

Vlastelica) and Wysocki are the individuals who would know the most about the relationship between Fox and Yardbarker and Jersey Chaser, and Leveyfilm took their depositions. Moreover, Fox produced a copy of the affiliate agreement between Yardbarker and Jersey Chaser, and Leveyfilm does not argue that there is anything more to the legal relationship between Fox and Jersey Chaser beyond that agreement. As the Court discussed previously, no reasonable juror could find that Fox controlled Jersey Chaser on the basis of the affiliate agreement.

Lastly, Leveyfilm argues that it was only "at the end of Mr. Vlastelica's deposition [that] Defendant opened the door to matters not merely involving the relationship between the parties, but the nuanced and highly technical underpinnings of the Yardbarker Network and its technological operations." R. 82 at 5. Clearly the technology Yardbarker used to include Jersey Chaser in its "network" is relevant to the law of infringement. Since the technological connection between the websites was a significant part their relationship and that of their owners (Fox and Wysocki), this issue was not beyond the Court's order that Leveyfilm could take discovery regarding the relationship between Fox, Yardbarker, Jersey Chaser, and Wysocki. Thus, Leveyfilm had the opportunity to take the discovery it now claims to lack, and the Court will not order additional discovery on this basis.

## B. Fair Use

Even if the Court was to find that Fox infringed Leveyfilm's copyright in the DVD cover photo, Fox is protected because Wysocki's use of the photo is protected by the fair use defense. The Copyright Act provides, in relevant part:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies of classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The Supreme Court has stated that a court "must consider" the four statutory factors, *Stewart v. Abend*, 495 U.S. 207, 237 (1990), but also that the factors are "illustrative and not limitative" and "provide only general guidance." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). In accordance with the Supreme Court's instructions, the Seventh Circuit has emphasized that the factors "are a checklist of things to be considered rather than a formula for decision." *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 522 (7th Cir. 2002). In *Ty*, the court "avoid[ed] rigid application of the copyright statute," by focusing on the "purpose of the [fair use] doctrine," *id.*, and the first two statutory factors: (1) the "purpose and character of the work;" and (2) the "effect of the use upon the potential market for . .

. the copyrighted work." The Seventh Circuit explained that first factor requires courts to determine whether certain copying of copyrighted works permissibly "transforms" and thus "complements" the original, as opposed to impermissibly creates a "substitute" that "supersedes" the original. *Id.* at 518.[8] The Seventh Circuit's analysis in *Ty* demonstrates that the dichotomy at the heart of the first factor between new works that transform and complement the original versus new works that serve as a substitute for and supersede the original, is best understood in terms of the fourth factor, i.e., the effect the new work has on the market for the original work. *See*, *generally*, *id.* An analysis that properly combines the first and fourth factors generally results in fair uses that fall into one of two categories: (1) a use that enhances the market for the original work (i.e., book reviews), *see id.* at 517; or (2) a use that creates a new market for the new work that references the original work and does not detract from the original work's market (i.e., parody), *see id.* at 518. In general, a court's determination of whether a use is fair is governed by "[t]he question [of] whether it would be unreasonable to conclude . . . that the use of the [original work] is a fair use." *Id.* at 522. However, "[f]air use is a mixed question of law and fact, which means that it may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion—but not otherwise." *Id.* at

---

[8] The Seventh Circuit did not describe its analysis of whether the new work transforms or supersedes the original as an application of the first factor in its *Ty* decision, though it did so in a more recent case. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012) ("Central to determining the purpose and character of a work is whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a different character.").

516 (internal citations and quotations omitted); *see also Brownmark Films*, 682 F.3d 687 (affirming district court's grant of summary judgment to defendants on fair use defense).

With regard to the purpose and character of the use at issue here, Wysocki wrote an article about a lawsuit concerning illegal use of the Super Bowl Shuffle video, and included a photo of the DVD cover because the video recorded on the DVD was the subject of her article. Wysocki's use of the photo to help explain the subject of her article is not the original use of the photo contemplated by Levey. Rather, Levey created the photo so that it could be used as the cover of the Super Bowl Shuffle record album and for other similar products, such as the DVD cover. Wysocki did not use the photo to promote a product or to illustrate an article about the Chicago Bears in general, or even the Super Bowl Shuffle in particular. As Leveyfilm contends, such a use could be considered to supersede the original use of the photo. R. 72 at 12. But here, Wysocki sought to write specifically about the Super Bowl Shuffle *lawsuit* which concerned illegal use of the video contained on the DVD. To a dispositive degree, the photo—due to its attachment to the DVD cover of the video at the center of the lawsuit—had become the news story itself. *See Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 307 (3d Cir. 2011) ("[H]ad the [i]mage itself become controversial due to its 'salacious' content, it would likely have been fair use for a newspaper to reproduce it to accompany an article about the controversy."). No reasonable juror could conclude that it was unfair for Wysocki to use a photo of the DVD cover (and by extension Levey's group-shot

photo) to explain the subject of her article. The only reasonable conclusion is that that Wysocki's article constitutes "news reporting" and qualifies as fair use.

Additionally, there is no evidence in the record that Wysocki's use of the DVD cover photo to report news of the lawsuit did or will impact the market for Leveyfilm's use of the photo. Beyond using the photo to market the Super Bowl Shuffle song and video, Levey may have contemplated licensing the photo as a wall-poster or other photo suitable for display. These actual and potential uses have in common that they require a high-quality copy of the photo. By contrast, Wysocki did not reproduce an original-quality copy of the photo, but instead used a copy of a copy that was already publicly available on the internet. There is no evidence in the record that the copy of the photo Wysocki published would have any effect on the market for Leveyfilm's photo, so no reasonable juror could conclude that it did have such an effect. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000) (affirming district court's grant of summary judgment finding that a poor reproduction of a professional photo of a model would not reduce demand for high-quality reproductions of the photo). Moreover, to the extent that Wysocki was interested in profiting from copying the photo, such profit would have been derived from the market for news about current events and gossip, not from Leveyfilm's market for a high-quality portrait photo.

Leveyfilm argues that Wysocki's use of the photo does not merit the "fair use" exception because Wysocki's article on Jersey Chaser was not "*bona fide* news reporting." R. 72 at 8 (emphasis added). But as Leveyfilm points out, the Supreme

Court has cautioned that "[c]ourts should be chary of deciding what is and what is not news." *Harper & Row Pub., Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985). Contrary to Leveyfilm's interpretation of this warning, the Supreme Court did not mean to say that courts should refrain from deciding that a certain use is fair because it constitutes news reporting. "The issue is not what constitutes 'news,' but whether a claim of news reporting is a valid fair use defense to an infringement of copyrightable expression." *Id.* In other words, it does not matter whether Wysocki engaged in "bona fide" news reporting on Jersey Chaser. That determination is often in the eyes of the beholder. What is important is whether Fox's claim that Wysocki's use of the DVD cover photo was fair and qualifies as news reporting is the only reasonable interpretation of the circumstances. As discussed above, the Court finds that it is.

Leveyfilm also argues that even if Wysocki's use of the DVD cover photo qualifies as news reporting, many "bona fide" news agencies have been found to have infringed copyrights. Certainly this is true, and Leveyfilm has cited several cases to exemplify the point. *See* R. 72 at 9. Of course, this cannot mean that the news reporting exception is never applicable to use of photographs. Notably, in a case similar to this, the First Circuit found that a newspaper's use of a photo was fair because the photo itself had become the news. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000). In *Nunez*, the defendant newspaper published several articles about Miss Puerto Rico and the news that she had posed for several risqué photographs. The newspaper also published copies of the

photographs along with the articles. The photographer sued for copyright infringement. The First Circuit held that by "using the photographs in conjunction with editorial commentary, [the newspaper] did not merely 'supersede[ ] the objects of the original creation[s],' but instead used the works for 'a further purpose,' giving them a new 'meaning, or message.'" 235 F.3d at 23 (quoting *Campbell*, 510 U.S. at 579); *see also Mathieson v. Associated Press*, 1992 WL 164447 (S.D.N.Y. June 25, 1992) (granting summary judgment and finding that defendant newspaper's use of a copy of a company's marketing pamphlet cover featuring a photo of Oliver North to illustrate a story about North's involvement with the company was fair use).

Unlike *Nunez*, in which the photo at issue was originally intended to be used as a type of art, the photos or videos at issue in the cases Leveyfilm cites were originally intended to record the subject of news reporting. *See Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119 (9th Cir. 1997) (video of the Reginald Denny beating during the Los Angeles riots of 1992); *McClatchey v. The Associated Press*, 2007 WL 776103 (W.D. Pa. Mar. 9, 2007) (photo of United Flight 93 crash on September 11, 2001).[9] In the cases Leveyfilm cites, it was obvious at the time the

---

[9] In *Update Art, Inc. v. Maariv Israel Newspaper, Inc.*, 635 F. Supp. 228 (S.D.N.Y. 1986)—another case Leveyfilm cites—the defendant newspaper reprinted a full page copy of a poster depicting Ronald Reagan's head superimposed on Rambo's body—a character dubbed "Ronbo"—to illustrate an article about the "Reaganization" of American cinema. *Id.* at 231. The court held that the "general purpose of defendants' use may be deemed to be commentary or news reporting," and that "this factor weighs in favor of the 'fair use' defense." *Id.* This use is analogous to Wysocki's use of the DVD cover photo to illustrate her article.

The Court in *Update Art* ultimately found, however, that the defendant newspaper's use was not fair because the full page newspaper copy would compete with the plaintiff's market for posters. As the Court has discussed previously, here,

video of the riot and photo of the crash were taken that the subjects being recorded were news worthy, so the original use of the video and photo was to record news. Unlike the defendant in *Nunez* who transformed the use of the photos at issue in that case from art to news reporting, the defendants in the cases Leveyfilm relies upon used the video and photo to report the news the plaintiffs had recorded, and by so doing, impermissibly usurped the plaintiffs' original intended uses.

The cases Leveyfilm cites are also distinguishable from Leveyfilm's claim because Wysocki did not usurp Levey's original use. Levey took a photo of certain Chicago Bears players during what has become a well-known event, i.e., creating the Super Bowl Shuffle song and video. Levey's sole reason for taking the photo was to create a photo suitable for marketing or display. He did not intend to record the event as potentially news worthy. By contrast, neither the Chicago Bears players generally, nor the Super Bowl Shuffle specifically, were the subject of Wysocki's article. It was the lawsuit over the video contained on the DVD that had become the newsworthy subject that Wysocki addressed. Since Levey's photo became attached to the cover of the DVD box, no reasonable juror could conclude that it was unreasonable for Wysocki to use this image when commenting on a controversy about the video contained on the DVD. Such use can only be described as "news reporting" and is worthy of the fair use exception.

Beyond the question of whether Wysocki's article and use of the photo should be considered "news reporting," Leveyfilm argues that the analysis of the first

there is no evidence in the record that Wysocki's use of the DVD cover photo will damage Leveyfilm's market for a high-quality portrait photo.

statutory factor should weigh against a finding of fair use because "[d]iscovery to date has revealed [Wysocki's] intent to be solely commercial, to enhance marketing revenue for her website, and to share those revenues with Fox/Yardbarker." R. 72 at 10. But commercial use does not eliminate the possibility that the use is fair. *See Campbell*, 510 U.S. at 584 ("If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting . . . ."). Even if Wysocki's use of the photo was driven by commercial interests—and as the Supreme Court noted, no person "but a blockhead ever wrote, except for money," *id.*—the salient question is to what extent Wysocki's use negatively impacted Leveyfilm's ability to use and profit from the photo in the future. As was discussed above, Wysocki's entry into the market for news reporting does not materially interfere with Leveyfilm's market for marketing- and display-quality photos.

Leveyfilm also argues that "Defendants cannot seriously suggest that the third factor, focusing on the amount copied, in any manner tips the use analysis their way." R. 72 at 12. Clearly, Wysocki reproduced the entire photo. But Wysocki did not reproduce a high-quality copy of the photo. Additionally, Wysocki reproduced the photo as it was formatted for marketing, meaning that she did not reproduce the photo in its original form, but as it had already been reformatted for a particular purpose—a purpose about which Wysocki was commenting. Using the entire photo of the DVD cover would not have served to illustrate the subject of

Wysocki's article—commentary on a lawsuit regarding the video recorded on the DVD. Thus, this factor does not weigh against a finding of fair use.[10]

Clearly, Wysocki's copy of the photo is not a substitute for the original and Wysocki's use of the photo does not supersede the original's intended use. Rather, Wysocki's use transformed the photo from a work suitable for marketing, or display as art, into the subject of a news report that complements the original use. Such use is fair and does not violate the Copyright Act.

Leveyfilm also argues that it cannot fully respond to Fox's fair use defense without additional discovery regarding Wysocki's "intent and motive" and "the effect of the infringement on the market for Plaintiff's work." R. 72 at 5-6. Wysocki's "intent" to use the DVD cover photo, however, is not in question or at issue. Neither party argues that Wysocki did not intend to use the photo. Rather, the fair use defense is concerned with the manner or "purpose and character" of Wysocki's use.

---

[10] The second statutory factor, "the nature of the copyrighted work," "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Fox does not argue that the DVD cover photo is not appropriately protected by copyright law. Even assuming that the photo is at "the core of intended copyright protection," this factor only reiterates that the DVD cover photo is deserving of copyright protection and does not help in determining whether Wysocki's use was fair. *See Campbell*, 510 U.S. at 586 ("This fact, however, is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works."); *Ty*, 292 F.3d at 522 (describing factor two as "empty"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) ("[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.").

Moreover, to the extent that Wysocki's intent is relevant, Leveyfilm has taken her deposition.

Leveyfilm also argues that it has not had an adequate opportunity to explore the effect of Wysocki's use of the DVD cover photo on the market for Leveyfilm's photo. Such evidence (or at least the ability to generate such evidence in the form of opinion reports) is as much within Leveyfilm's control as that of Fox, if not more so. Presumably, Leveyfilm is familiar with the market for its photo and any effect Fox's use has had on that market. Leveyfilm has not produced any such evidence. The Court finds that no additional discovery is necessary to find that no reasonable juror could find Fox's fair use defense inadequate.

In general, although Leveyfilm has identified several issues (related to both infringement and fair use) about which it would like to take additional discovery, Leveyfilm has not explained why it could not address these issues in the discovery that it was permitted to take. Leveyfilm repeatedly argues that there is an insufficient factual record for the Court to grant summary judgment to Fox, but Leveyfilm has not specifically identified the discovery that could resolve this alleged deficiency. Since Leveyfilm was permitted to take discovery regarding the relevant individuals, entities, and issues, and Leveyfilm has not identified what other discovery it is entitled to, the Court will not defer consideration of Fox's motion.

## II.    The Digital Millennium Copyright Act

The Digital Millennium Copyright Act provides the following in relevant part:

> (a) No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—
>> (1) provide copyright management information that is false, or
>> (2) distribute . . . copyright management information that is false.
>
> (b) No person shall, without the authority of the copyright owner or the law—
>> (1) intentionally remove or alter any copyright management information,
>> (2) distribute . . . copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>> (3) distribute . . . copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202. For a defendant to be liable under any of these provisions, the defendant must "provide," "distribute," "remove," or "alter" copyright management information. But as the Court explained in discussing Leveyfilm's claim of direct infringement, the evidence in the record would not permit a reasonable juror to conclude that Fox possessed a copy of the DVD cover photo because a reasonable juror could only conclude that the DVD cover photo was never saved to Yardbarker's servers. If Fox did not possess a copy of the DVD cover photo, Fox could not "distribute" it or "remove or alter [its] copyright management information." Thus, Fox is not liable under the Digital Millennium Copyright Act.

Nevertheless, even if Fox—in addition to Wysocki—used the photo and infringed Leveyfilm's copyright, there is no evidence that Fox had either the "intent to induce, enable, facilitate, or conceal infringement," or act "knowing, or . . . having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement," as the statute requires *See* 17 U.S.C. § 1202. As an initial matter, these two phrases from the statute are nearly identical to the elements of contributory infringement. *See Flava Works*, 689 F.3d at 757 (contributory infringement is "personal conduct that encourages or assists the infringement"), and the Court has already found that no reasonable juror could find Fox liable for contributory infringement. Furthermore, the Court has found that Fox's purpose in using the DVD cover photo (to the extent Fox can be said to have used it) was fair in that it qualified as news reporting. Since Fox's purpose in using the photo is protected by the fair use defense, it is illogical to also conclude that Fox intended to contribute to or conceal an infringement. *Cf. Murphy*, 650 F.3d at 302 n.8 ("§ 1202 applies only when a defendant knows or has reasonable grounds to know that the removal will 'induce, enable, facilitate, or conceal' an infringement. Thus, those intending to make fair use of a copyrighted work are unlikely to be liable under § 1202."). Fox had no motive to "conceal" an infringement for which it would not be liable.

## Conclusion

For the foregoing reasons, Fox's motions, R. 31, R. 60, are granted, and all counts in the complaint as they pertain to Fox are dismissed.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  July 8, 2014